1

2

3   **Sarah Roubidoux Lawson**, AZB #023708
Email: slawson@schwabe.com

4   SCHWABE, WILLIAMSON & WYATT, P.C.
1420 Fifth Avenue, Suite 3400

5   Seattle, WA  98101
Telephone: 206.622.1711

6   Facsimile: 206.292.0460

7        Of Attorneys for Proposed Intervenor-Defendant Navajo
        Transitional Energy Company LLC

8

9

10

11                     **UNITED STATES DISTRICT COURT**

12                 **DISTRICT OF ARIZONA (Prescott Division)**

13

14   **DINÉ CITIZENS AGAINST RUINING**              No. 3:16-cv-08077-SPL
     **OUR ENVIRONMENT,** *et al.,*

15                                            NAVAJO TRANSITIONAL ENERGY
                     Plaintiffs,             COMPANY LLC'S LIMITED

16                                            MOTION TO INTERVENE AND
           vs.                                MEMORANDUM OF POINTS AND

17                                            AUTHORITIES IN SUPPORT

18   **BUREAU OF INDIAN AFFAIRS,** *et al.,*
                                            **ORAL ARGUMENT REQUESTED**

19                    Defendants.

20   **I.      MOTION AND INTRODUCTION**

21           Pursuant to Federal Rule of Civil Procedure ("FRCP") 24(a)(2), Navajo Transitional

22   Energy Company LLC ("NTEC") moves for leave to intervene in this case for the limited

23   purpose of establishing that this action cannot proceed in NTEC's absence and filing a motion to

24   dismiss pursuant to FRCP 19 and 12(b)(7).  NTEC seeks to stop plaintiffs from interfering with

25   decisions that the Navajo Nation (the "Nation") has made to renew the site lease for the Four

26   Corners Power Plant ("FCPP") and the continued mining and supply of the power plant by the

27   Navajo Mine.  At issue are the leases, rights-of-ways, and permits approved by the United States

28   Department of the Interior ("DOI") and the Office of Surface Mining Reclamation and

Page 1    NAVAJO TRANSITIONAL ENERGY COMPANY
         LLC'S LIMITED MOTION TO INTERVENE AND
         MEMORANDUM OF POINTS AND AUTHORITIES IN
         SUPPORT
         PDX\130242\216853\SELA\19013597.1

         SCHWABE, WILLIAMSON & WYATT, P.C.
                  Attorneys at Law
             1420 Fifth Avenue, Suite 3400
                 Seattle, WA  98101
               Telephone: 206.622.1711
                 Fax: 206.292.0460

Enforcement ("OSMRE"), Bureau of Indian Affairs ("BIA") and Bureau of Land Management ("BLM") for FCPP and the Navajo Mine (the "Mine") after a lengthy and thorough investigation and review process during which NTEC and the Nation were extensively consulted.

Counsel for NTEC has conferred with counsel for plaintiffs, defendant government agencies and defendant-intervenor Arizona Public Services ("APS"). The government takes no position on the motion to intervene.  Plaintiffs oppose NTEC's motion to intervene and motion to dismiss.  APS does not oppose NTEC's motion to intervene or motion to dismiss.

This motion is supported by the Declaration of Charles Cicchetti, Ph.D ("Cicchetti Decl."), the Declaration of Clark Moseley ("Moseley Decl."), the Declaration of Doreen Tanner ("Tanner Decl."), the Declaration of Harry Scott ("Scott Decl."), and the Declaration of Vecenti Benally ("Benally Decl.").  A proposed form of order granting NTEC's motion to intervene is attached hereto as Exhibit A.  NTEC's Motion to Dismiss is attached hereto as Exhibit B.

## II.    FACTUAL BACKGROUND[1]

### A.    THE NAVAJO NATION AND FEDERAL GOVERNMENT HAVE APPROVED OPERATION OF THE MINE AND POWER PLANT

The Mine and FCPP sit on the Nation and have been a critical source of royalties, taxes, jobs and economic opportunity for the Nation for over half a century.  Cicchetti Decl. ¶ 40; Moseley Decl. ¶ 4.  Over those 50 years, the Nation has regularly confirmed its commitment to the Mine and FCPP with lease renewals and authorizations, and by securing a first right of refusal for the Nation to purchase the Mine.  Then, in 2013, the Nation, through legislation, formed NTEC to purchase the Mine and negotiate coal supply agreements with FCPP.  The goal of NTEC is to maintain the revenue stream from the Mine and FCPP for the Nation, while utilizing the profits from the Mine to advance transitional energy projects and facilitate economic development.  Navajo Nation Resolution CAP-20-13, as amended by CO-58-13 ("NTEC Formation Resolution").

---

[1] The Factual Background sections in NTEC's Motion to Intervene and Motion to Dismiss are identical.

Page 2    NAVAJO TRANSITIONAL ENERGY COMPANY'S LIMITED MOTION TO INTERVENE AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

PDX\130242\216853\SELA\19013597.1

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1420 Fifth Avenue, Suite 3400
Seattle, WA  98101
Telephone: 206.622.1711
Fax: 206.292.0460

1    Prior to 2013, NTEC's predecessor and the FCPP formally sought renewals to ongoing

2    leases entered into between FCPP and the Nation and rights-of-way across Nation lands, and

3    renewal and modification to a mining permit to continue operation of the Mine and FCPP past

4    the previous expiration of July 2016.  As a necessary part of assessing the lease, right-of-way

5    ("ROW"), and permit applications, the federal defendants conducted a consolidated analysis of

6    environmental impacts in consultation with NTEC and the Nation.  After a multi-year analysis of

7    impacts to the environment and endangered and threatened species pursuant to the Endangered

8    Species Act ("ESA") and the National Environmental Policy Act ("NEPA"), the defendants in

9    July 2015 issued the Record of Decision, which was the final condition precedent for issuance of

10   the series of leases, ROWs, and permits to allow the Mine and FCPP to continue to operate

11   ("The Approvals").  In April 2016, plaintiffs filed this action, ostensibly challenging the federal

12   agencies' actions under the ESA and NEPA but functionally challenging The Approvals

13   authorized thereby.

14   The Approvals include a lease entered into by the Nation and authorizations granted to

15   NTEC—the Navajo Nation entity that now owns the Mine.  Thus they reflect authorizations

16   given by the Nation for activities impacting Navajo resources entrusted to NTEC.  As a

17   sovereign nation, the Nation has the right to manage its natural resources and preserve vital

18   Nation-based economies.  Tribes are "distinct political communities, having territorial

19   boundaries, within which their authority is exclusive... which is not only acknowledged, but

20   guaranteed by the United States." *Worcester v. Georgia*, 31 U.S. 515, 557 (1832); *Merrion v.*

21   *Jicarilla Apache*, 455 U.S. 130, 139-141 (1982) (finding that tribes have "inherent right" to

22   "self-government and territorial management").

23   Under the Navajo Treaty of 1868 between the Nation and the United States, the Nation

24   reserved unto itself the right to manage its lands, including the right to exclude outsiders.  Treaty

25   of Bosque Redondo, 15 Stat. 667 (1868).  Nation lands are set apart as a permanent homeland for

26   the Navajo people, and for their exclusive use and occupation without interference.  Article XIII,

27   15 Stat. 671.  The United States agreed that no persons except the Navajo should ever be

28   Page 3    NAVAJO TRANSITIONAL ENERGY COMPANY'S
              LIMITED MOTION TO INTERVENE AND
              MEMORANDUM OF POINTS AND AUTHORITIES IN
              SUPPORT THEREOF

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1420 Fifth Avenue, Suite 3400
Seattle, WA  98101
Telephone: 206.622.1711
Fax: 206.292.0460

PDX\130242\216853\SELA\19013597.1

permitted to pass over, settle upon, or reside in the lands of the Navajo Nation.  Article II, 15 Stat. 668.

The environmental reviews conducted by the federal defendants reflect a continuing cooperation amongst the governments of sovereigns, and is not an abrogation of sovereign immunity.  Plaintiffs' requested relief invalidates the lease renewals entered into by the Nation, the ROWs over Navajo Nation land, and the mining permit granted to NTEC.  Any threat to the validity of The Approvals also threatens the continued operation of the Mine and FCPP and the hundreds of jobs and hundreds of millions of dollars the Mine and FCPP bring to the regional economy.[2]

**B.    THE PARTIES**

**1.    NTEC Is a Navajo Corporation Created for the Benefit of the Navajo Nation to Manage the Nation's Energy Resources**

The Nation has long been burdened by outside interests using Navajo land and taking Navajo natural resources for those outside interests' own profits.  For that reason, in 2013, the Nation created NTEC to protect and promote the economic and financial interests of the Nation and the Navajo people while remaining dedicated to responsible management of the Nation's natural resources.  Moseley Decl. ¶ 3.  The Nation also created NTEC with the specific purpose of moving towards sustainable energy development within the Nation's boundaries.  *Id.*

NTEC owns and operates the Mine on land held in trust by the federal government for the benefit of the Nation, leased with the consent of the Nation, and located entirely within the boundaries of the Nation.  Moseley Decl. ¶ 4.  The Mine supplies coal exclusively to the nearby FCPP, which is also on Nation trust land, leased with the consent of the Nation, and entirely within the boundaries of the Nation.  *Id.*  NTEC and FCPP operate pursuant to the mining permits, ROWs, and leases challenged by plaintiffs in this case.  *Id.*

---

[2] Plaintiffs' requested relief is vague and indefinite.  NTEC does not concede that plaintiffs are entitled to any relief, up to and including interruption or shut down of the Mine and FCPP operations.

NAVAJO TRANSITIONAL ENERGY COMPANY'S LIMITED MOTION TO INTERVENE AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

PDX\130242\216853\SELA\19013597.1

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1420 Fifth Avenue, Suite 3400
Seattle, WA  98101
Telephone: 206.622.1711
Fax: 206.292.0460

1   NTEC is a wholly-owned Navajo corporation located on the Nation and incorporated

2   pursuant to Navajo law.  Moseley Decl. ¶ 5.  The Nation is a sovereign nation that is immune

3   from suit under Navajo law.  1 N.N.C. § 553(A) ("[t]he Navajo Nation is a sovereign nation

4   which is immune from suit.").  The Nation's sovereign immunity is inherent, and is neither

5   judicially created nor bestowed on the Nation by any other government. 1 N.N.C. § 553(B).  The

6   Nation expressly extended its sovereign immunity to NTEC under both its enabling legislation,

7   NTEC Formation Resolution §§ ACD, A(9), and Article IX of the Operating Agreement.

8   Moseley Decl. ¶¶ 5, 8, Exhibit 1 at 32.

9   NTEC was created in support of Navajo self-government through adherence to the

10   Nation's regulatory and adjudicatory authorities, duties, and functions.  Moseley Decl. ¶ 6.

11   NTEC was created and enabled by the NTEC Formation Resolution, and is managed and

12   operated pursuant to the Operating Agreement with the Nation.  *Id*.  NTEC was created to protect

13   and promote the Nation's economic and financial best interests related to mining as a means to

14   ameliorate the Nation's economic, financial, and social conditions.  *Id*.  Pursuant to NTEC's

15   organizational charter, a percentage of the net income generated by the Mine will be reinvested

16   to fund research and development of renewable and alternate sources of energy on the Nation.

17   *Id*.

18   NTEC is organized pursuant to the Navajo Nation Limited Liability Company Act,

19   Navajo Nation Code tit. 5, § 3600.  Moseley Decl. ¶ 7.  NTEC is a single-member

20   Navajo limited liability company, and the Nation is the sole member.  *Id*.  NTEC is exclusively a

21   Navajo company and is not incorporated in any U.S. state or territory.  *Id*. The Nation's

22   ownership is represented by a Member Representative Group consisting of five members of the

23   Navajo Nation Council.  *Id*.  NTEC is managed on behalf of the Nation by a Management

24   Committee.  *Id.*  A Navajo Nation selection committee appoints the Management Committee

25   members.  *Id*.

26   As a single-member limited liability company, NTEC's profits are the Nation's profits,

27   and NTEC makes distributions of net income to the Nation in accordance with the NTEC

28
NAVAJO TRANSITIONAL ENERGY COMPANY'S
LIMITED MOTION TO INTERVENE AND
MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT THEREOF
PDX\130242\216853\SELA\19013597.1

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1420 Fifth Avenue, Suite 3400
Seattle, WA  98101
Telephone: 206.622.1711
Fax: 206.292.0460

Formation Resolution and the Operating Agreement.  Moseley Decl. ¶ 8.  Because NTEC's activities are so closely tied to the Nation, the purposes of sovereign immunity are properly served by the Nation's extension of immunity to NTEC.  *Id.*

### 2.    Plaintiffs Are Five Citizen Groups

Plaintiffs are five citizen groups: Diné Citizens Against Ruining Our Environment, San Juan Citizens Alliance, Center for Biological Diversity, Amigos Bravos, and the Sierra Club. Each of these citizen groups objected to the Environmental Reviews Record of Decision ("ROD") before the agencies.  Those objections were considered and addressed by the federal defendants, but ultimately failed.

### 3.    Defendants Are Federal Agencies with Authority to Regulate and Approve Certain Activities on Navajo Reservation Lands

Defendants are the BIA, OSMRE, BLM, Fish and Wildlife Service ("FWS"), DOI, and Sally Jewell, in her official capacity as Secretary of the U.S. Department of the Interior (the "Secretary").  BIA, OSMRE, BLM, and FWS are all agencies within DOI.  DOI is a cabinet-level agency, and the Secretary is the head of DOI.  The government-to-government relationship between the United States and the Nation was established by treaty in 1849, wherein the United States promised to "legislate and act as to secure the permanent prosperity" of the Navajo people. Article 11, Treaty With The Navaho, 9 Stat. 974 (1849).  The BIA approved the challenged leases, ROWs, and permits with the consent of the Nation, and in accordance with the federal trust responsibility, federal law, and promises made to the Nation under the 1849 Treaty With The Navaho.

### C.    CLOSURE OF THE MINE WOULD BE DEVASTATING TO NTEC, MINE WORKERS AND THE REGION

Any threat to the continued operation of the Mine would not only cause a loss of irreplaceable revenue to the Nation, it would also cause NTEC to go into debt and the loss of important jobs.  Cicchetti Decl. ¶ 12.  The impact of a shutdown would hit an already economically vulnerable region with extraordinary unemployment, hovering at 50% for the

NAVAJO TRANSITIONAL ENERGY COMPANY'S
LIMITED MOTION TO INTERVENE AND
MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT THEREOF

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1420 Fifth Avenue, Suite 3400
Seattle, WA  98101
Telephone: 206.622.1711
Fax: 206.292.0460

PDX\130242\216853\SELA\19013597.1

Nation.  *Id.* at ¶ 8, 18.  Many mine workers have the best-paying job in their families and support their extended relatives.  Tanner Decl. ¶ 5; Scott Decl. ¶ 5, Benally Decl. ¶ 4.  Closure of the Mine would be a disaster now and have disastrous consequences in the future. Cicchetti Decl. ¶ 36, 37.

### 1.    NTEC and the Nation Would Go into Significant Debt if the Mine Closed

In 2013, the Nation, through NTEC, purchased the Mine from BHP Billiton under a three year note for $85 million dollars.  Moseley Decl. ¶ 9.  In July 2016, NTEC obtained a new loan that paid off the original note and secured an additional line of credit to ensure working capital for the future, for a total of about $115 million dollars.  *Id.* The new loan is secured by NTEC's entire catalog of assets, including the Mine itself.  *Id.* If the Mine was forced to shut down, NTEC would risk defaulting on payments under the new loan, putting NTEC's assets at risk of foreclosure.  *Id.*  In a foreclosure, NTEC would lose every single asset it owns, up to and including the Mine.  *Id.*  Without ownership and control of the Mine, NTEC would be forced to cease operation, and the Nation would lose the millions of dollars it contributed to NTEC's start-up costs and anticipated revenues from a fifteen-year Coal Supply Agreement between NTEC and FCPP.  *Id.*  Even worse, NTEC and the Nation would lose control of the natural resources and jobs they have worked so hard to protect.

### 2.    Any Threat to Continued Operation of the Mine Will Result in the Loss of Critical Jobs

The Mine employs 397 people and provides some of the best-paying jobs in the region. Scott Decl. ¶ 4, Cicchetti Decl. ¶ 10, 13.  Mine workers support not only their immediate family, but also their extended families.  This support is called Ke' and is inherent in the Navajo way of life.  Scott Decl. ¶ 2, Benally Decl. ¶ 2.  Doreen Tanner has worked at the Mine as a heavy equipment operator for 27 years.  Tanner Decl. ¶ 1.  She supports her three children, her four grandchildren and her parents in various ways.  *Id.* at ¶ 5.  In the wintertime especially, extended family who have no work ask for money for food, gas and heat.  *Id.* at ¶ 6.  They come to her

NAVAJO TRANSITIONAL ENERGY COMPANY'S LIMITED MOTION TO INTERVENE AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1420 Fifth Avenue, Suite 3400
Seattle, WA  98101
Telephone: 206.622.1711
Fax: 206.292.0460

PDX\130242\216853\SELA\19013597.1

because they know she has a good job at the Mine.  *Id.*  Her parents live in a rundown trailer with malfunctioning electrical equipment.  *Id.* at ¶ 5.  She is concerned about the fire hazard and will purchase them a new trailer.  *Id.*

Harry Scott, a 15 year Navajo mine mechanic, also supports his extended family with his wages.  Scott Decl. ¶ 4.  He and his schoolteacher wife support as many as 10 to 12 other people.  *Id.* at ¶ 5.  Scott strongly believes that education is the best way to improve the Navajo Nation and has used his wages to finance his four children's education.  *Id.* at ¶ 6.  He appreciates the apprenticeship programs and other training available at the Mine to further education.  *Id.*  If he lost his job, Scott would lose his house and car and ability to support his children and grandchildren.  *Id.* at ¶ 7.

Vecenti Benally, a 32 year employee of the mine, plans to retire at the mine after putting in 50 years of work.  Benally Decl. ¶ 1.  He supported his children through college as a mine worker and continues to support his children, nephew and niece's children with basics such as food and clothing when they cannot make ends meet.  *Id.* at ¶ 4.  Losing his job would be devastating: he would lose his house and car and his child would also lose his house.  *Id.* at ¶ 7.  The towns of Farmington and Kirtland would be devastated, because the contractors and others who rely on the mine for business would be out of work.  *Id.*  His job is not replaceable.  *Id.* at ¶ 6.  He would have to travel as far as Wyoming to find similar wages.  *Id.*

### 3.      Any Threat to Continued Operation of the Mine Would Have a Devastating Economic Effect on the Region

The 397 Mine employees and their families are not the only ones that would be affected if The Approvals are found to be invalid.  Closing the Mine and FCPP would cause likely even more devastation to San Juan County and the Nation than a coal-mining state such as West Virginia, because there are simply no other jobs available.  Cicchetti Decl. ¶ 14.  Closing FCPP and the Mine means that San Juan County could become the poorest economic area in the United States.  *Id.*  A recent report authored by Arizona State University ("ASU") and considered by the federal defendants in the environmental reviews calculates the economic effect of the Mine and

NAVAJO TRANSITIONAL ENERGY COMPANY'S
LIMITED MOTION TO INTERVENE AND
MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT THEREOF

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1420 Fifth Avenue, Suite 3400
Seattle, WA  98101
Telephone: 206.622.1711
Fax: 206.292.0460

PDX\130242\216853\SELA\19013597.1

the FCPP on San Juan County.  Between 2016 and 2041, shuttering the Mine and FCPP would cause losses of 53,790 job-years, labor income of $3.98 billion, and San Juan County gross product of $9.66 billion.  *Id.* at ¶ 27-28.

Dr. Charles Cicchetti, a noted economist who has studied the region for years is adamant that the closure of the FCPP and the Mine would be economic disaster for the region.  He says:

> The Navajo Mine and Four Corners Power Plant have, for more than 50-years, provided a stable source of employment for the residents of San Juan County, including hundreds of Native Americans who live in the Northern and Eastern Agencies area of the Navajo Nation, which suffers from very high unemployment levels. . . . I urge the Court to recognize the importance to the region of keeping open the Navajo Mine and Four Corners Power Plant.  A failure to do so would be devastating to an already crippled local economy.

Cicchetti Decl. ¶ 40-41.

## III.    ARGUMENT

NTEC has a critical interest at stake in this litigation.  It is not an overstatement to say that plaintiffs' success in overturning the mining lease on which NTEC operates would be disastrous for the local economy.   The federal government cannot adequately defend NTEC's interests on this issue.  NTEC's timely motion to intervene should be granted and NTEC should be allowed to protect its vital interests.

### A.    NTEC'S MOTION TO INTERVENE TO FILE A MOTION TO DISMISS IS NECESSARY AND APPROPRIATE

Existing long before the U.S. Constitution, tribal nations are "domestic dependent nations."  *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2030 (2014).  Tribal nations thus possess sovereign immunity and cannot be joined in litigation without their express consent. *Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523 U.S. 751, 754 (1998); *Pit River Home & Agric. Co-op. Ass'n v. United States*, 30 F.3d 1088, 1100 (9th Cir. 1994); *Confederated Tribes of the Chehalis Indian Reservation v. Lujan*, 928 F.2d 1496, 1499 (9th Cir. 1991) ("Indian tribes . . . are sovereign entities and are therefore immune from nonconsensual actions in state or federal

NAVAJO TRANSITIONAL ENERGY COMPANY'S LIMITED MOTION TO INTERVENE AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1420 Fifth Avenue, Suite 3400
Seattle, WA  98101
Telephone: 206.622.1711
Fax: 206.292.0460

PDX\130242\216853\SELA\19013597.1

court."); *Tohono O'odham Nation v. Ducey,* ---F. Supp. 3d ---, 2016 WL 1241888, at *5 (D. Az. 2016). The Ninth Circuit has long held that sovereign immunity extends to business activities of a tribe, not just government activities. *See, e.g.*, *Allen v. Gold Country Casino*, 464 F.3d 1044, 1046 (9th Cir. 2006) (so holding); *Cook v. AVI Casino Enterprises, Inc.*, 548 F.3d 718, 725 (9th Cir. 2008) (same); *see also Miller v. Wright*, 705 F.3d 919, 923–24 (9th Cir. 2013), cert. denied, ––– U.S. ––––, 133 S. Ct. 2829 (2013) (holding tribal sovereign immunity not only protects tribes themselves, but also extends to arms of the tribe acting on behalf of the tribe). Here, NTEC has the same sovereign immunity as the Navajo Nation.[3]

Federal courts routinely grant motions for limited intervention under Rule 24(a) to lodge Rule 19 objections by tribes, states, territories and foreign countries. *See, e.g., United Keetoowah Band of Cherokee Indians of Okla. v. United States*, 480 F.3d 1318, 1323 (Fed. Cir. 2007) [noting tribe's limited intervention to seek dismissal] pursuant to Rule 19(b); reversing on merits of Rule 19(b) analysis); *Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Norton*, 422 F.3d 490, 495 (7th Cir. 2005) (noting tribe's limited intervention to seek dismissal); affirming dismissal on other grounds); *Salton, Inc. v. Philips Domestic Appliances & Pers. Care B.V.*, 391 F.3d 871, 875, 878 (7th Cir. 2004) (same concerning Hong Kong corporation; reversing on the merits of Rule 19(b) analysis); *Southwest Ctr. for Biological Diversity v. United States Bureau of Reclamation*, 143 F.3d 515, 519-520, 522 (9th Cir. 1998) (same concerning states; affirming denial of motion as moot). Similar to these cases, NTEC seeks to intervene only to assert its Rule 19 objection and Motion to Dismiss. Like these cases, NTEC's limited intervention is appropriate.

**B.    NTEC IS ENTITLED TO INTERVENE AS A MATTER OF RIGHT**

There should be no dispute that NTEC is entitled to intervene in this case as a matter of right. Indeed, plaintiffs made no objection to Arizona Public Service Company's motion to

---

[3] NTEC's sovereign immunity is explained at length in the accompanying motion to dismiss and incorporated herein. See Motion to Dismiss at 9-10.

Page 10   NAVAJO TRANSITIONAL ENERGY COMPANY'S
LIMITED MOTION TO INTERVENE AND
MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT THEREOF

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1420 Fifth Avenue, Suite 3400
Seattle, WA  98101
Telephone: 206.622.1711
Fax: 206.292.0460

PDX\130242\216853\SELA\19013597.1

1   intervene, which this court swiftly granted.  See Docket at 18.  FRCP 24(a) provides:

2        On a timely motion, the court must permit anyone to intervene
         who:
3        ….
4        (2) claims an interest relating to the property or transaction that is
         the subject of the action, and is so situated that disposing of the
5        action may as a practical matter impair or impede the movant's
         ability to protect its interest, unless existing parties adequately
6        represent that interest.

7   A movant is entitled to intervene as a matter of right under this provision if four requirements are

8   met: "(1) the intervention application is timely; (2) the applicant has a significant protectable

9   interest relating to the property or transaction that is the subject of the action; (3) the disposition

10  of the action may, as a practical matter, impair or impede the applicant's ability to protect its

11  interest; and (4) the existing parties may not adequately represent the applicant's interest."

12  *Citizens for Balanced Use v. Mont. Wilderness Ass'n*, 647 F.3d 893, 897 (9th Cir. 2011) (quoting

13  *Prete v. Bradbury*, 438 F.3d 949, 954 (9th Cir. 2006)). These requirements are "broadly

14  interpreted in favor of intervention" and are evaluated "primarily by practical considerations, not

15  technical distinctions." *Id.* (internal quotation marks and citation omitted).   NTEC's motion to

16  intervene meets all four requirements.

17           **1.       NTEC's Motion is Timely**

18           There is no dispute that NTEC has timely moved for leave to intervene as a defendant in

19  this action.  Determining whether a motion to intervene is timely requires a "nuanced,

20  pragmatic" evaluation that considers the state of the proceedings, the prejudice to other parties,

21  and the reasons for and length of the delay.  *League of United Latin Am. Citizens v. Wilson*, 131

22  F.3d 1297, 1302-03 (9th Cir. 1997).  The complaint was filed on April 20, 2016.  This court

23  recently adopted a case management order on August 24, 2016.  Docket 30.  This is an

24  administrative record case and plaintiffs are required to file the record by October 28, 2016.  The

25  deadline for joining parties, amending pleadings and filing supplemental pleadings is January 6,

26  2017.  NTEC's motion to intervene at this stage of the proceedings will not prejudice the existing

27

28  Page 11   NAVAJO TRANSITIONAL ENERGY COMPANY'S
           LIMITED MOTION TO INTERVENE AND
           MEMORANDUM OF POINTS AND AUTHORITIES IN
           SUPPORT THEREOF

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1420 Fifth Avenue, Suite 3400
Seattle, WA  98101
Telephone: 206.622.1711
Fax: 206.292.0460

PDX\130242\216853\SELA\19013597.1

1   parties or delay the resolution of the litigation.[4]

2          **2.      NTEC has a significant, protectable interest related to its ownership**

3                  **of the Navajo Mine**

4          The second requirement of intervention is primarily a practical one.  *U.S. v. City of Los*

5   *Angeles*, 288 F.3d 391, 397-98 (9th Cir. 2002) (the second intervention factor is "primarily a

6   practical guide to disposing of lawsuits by involving as many apparently concerned persons as is

7   compatible with efficiency and due process").  It is sufficient that the interest is "protectable

8   under some law and that there is a relationship between the legally protected interest and the

9   claims at issue." *Citizens for Balanced Use*, 647 F.3d at 897; *Southwest Center for Biological*

10  *Diversity v. Berg.*, 268 F.3d 810, 818 (9th Cir. 2001) (holding both the "interest" and

11  "relationship" requirements are satisfied when "injunctive relief sought by the plaintiffs will

12  have direct, immediate, and harmful effects upon a third party's legally protectable interests").

13  Among those interests protected by the law are real property ownership rights. *Sierra Club v.*

14  *U.S. E.P.A.*, 995 F.2d, 1478, 1482-83 (9th Cir. 1993), *overruled on other grounds by Wilderness*

15  *Soc. v. U.S. Forest Service*, 630 F.3d 1173 (9th  Cir. 2011)) (finding city's ownership of

16  wastewater treatment plants to be significant protectable interest in lawsuit by environmental

17  organization to compel EPA to change terms of permits).

18         Plaintiffs challenged the validity of The Approvals and threaten the continued operation

19  of the Mine and FCPP.  Any drastic remedy plaintiff seek will harshly impair NTEC's—and the

20  region's—economic interests.  As owner of the Mine, NTEC has an indisputable property

21  interest in this case and its resolution.

22         **3.      If Plaintiffs Succeed in This Case, NTEC's Interests Will Be Severely**

23                 **Impaired**

24         To meet the third requirement, once NTEC establishes its interest, NTEC need only show

25  that interest would be substantially affected in a practical sense to be entitled to intervene.  *See,*

26  _____

27         [4] Indeed, granting NTEC's motion to intervene will dispose of this case entirely as explained in NTEC's Motion to Dismiss.  *See* Exhibit B.

28  Page 12   NAVAJO TRANSITIONAL ENERGY COMPANY'S
           LIMITED MOTION TO INTERVENE AND
           MEMORANDUM OF POINTS AND AUTHORITIES IN
           SUPPORT THEREOF

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1420 Fifth Avenue, Suite 3400
Seattle, WA  98101
Telephone: 206.622.1711
Fax: 206.292.0460

PDX\130242\216853\SELA\19013597.1

1   *e.g., Citizens for Balanced Use*, 647 F.3d at 898 (quoting FRCP 24 advisory committee note).  It

2   is not a high burden.  *Grutter v. Bollinger*, 188 F.3d 394, 399 (6th Cir. 1999) ("To satisfy this

3   element of the intervention test, a would-be intervenor must show only that impairment of its

4   substantial legal interest is possible if intervention is denied. This burden is minimal").  As

5   explained above, NTEC's property and financial interests would certainly be harmed if plaintiffs

6   succeed in this case.  As the owner and operator of the Mine, NTEC has every right to defend

7   against the potential shut-down of its operations.

8   **4.      The Federal Government Does Not and Cannot Adequately Represent
            NTEC's Interests**

9

10   The final requirement for intervention as a matter of right is to show that the existing

11   parties do not adequately represent the interests of NTEC.  Here, it is clear that the federal

12   government cannot represent NTEC's significant interests in this litigation.  The burden of

13   demonstrating inadequacy is minimal and can be satisfied by showing that the existing parties'

14   representation "may be" inadequate.  *Trbovich v. United Mine Workers of Am.*, 404 U.S. 528,

15   538 n.10 (1972); *Citizens for Balanced Use*, 647 F.3d at 898.  In assessing whether the existing

16   parties' representation may be inadequate, the Ninth Circuit considers "'(1) whether the interest

17   of a present party is such that it will undoubtedly make all of a proposed intervenor's arguments;

18   (2) whether the present party is capable and willing to make such arguments; and (3) whether a

19   proposed intervenor would offer any necessary elements to the proceeding that other parties

20   would neglect.'" *Citizens for Balanced Use*, 647 F.3d at 898 (quoting *Arakaki v. Cayetano*,

21   324 F.3d 1078, 1086 (9th Cir. 2003)).

22   Setting aside the federal government's long history of not representing the Nation's rights

23   even when it had the obligation to do so, s*ee, e.g., Navajo Nation v. U.S.*, 263 F.3d 1325,

24   1332 (Fed Cir. 2001), *reversed on other grounds*, 537 U.S. 488 (2003) (holding federal

25   government violated "the most basic common law fiduciary duties owed to the Navajo Nation"),

26   the federal government's interests in this matter are quite different from those of NTEC.

27   The federal defendants in this case represent the interests of the general public.  In

28   Page 13   NAVAJO TRANSITIONAL ENERGY COMPANY'S
            LIMITED MOTION TO INTERVENE AND
            MEMORANDUM OF POINTS AND AUTHORITIES IN
            SUPPORT THEREOF

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1420 Fifth Avenue, Suite 3400
Seattle, WA  98101
Telephone: 206.622.1711
Fax: 206.292.0460

1    contrast, at a minimum, NTEC represents a narrower economic interest.  Plaintiffs seek a remedy

2    that will require federal defendants to comply with procedural requirements and alter NTEC's

3    property rights related to the Mine.  The federal defendants will seek to defend their

4    administrative actions where NTEC seeks to protect its significant property right and financial

5    investments that will be affected by the outcome of this case.  Ultimately, the federal government

6    does not have an economic interest in the Mine and will not seek to protect NTEC's interests.[5]

7    NTEC must be allowed to speak for itself.

8    **IV.    CONCLUSION**

9            For the foregoing reasons, NTEC requests that this court grants its motion to intervene

10   for the limited purpose of filing a motion to dismiss.

11

12           Respectfully submitted this 15th day of September, 2016.

13                                                  SCHWABE, WILLIAMSON & WYATT, P.C.

14                                        By:    /s/ Sarah Roubidoux Lawson
15                                                Sarah Roubidoux Lawson (AZ 023708)
                                                 Telephone: 206.622.1711
16                                               Facsimile: 206.292.0460
                                                 Of Attorneys for Proposed Intervenor-
17                                               Defendant Navajo Transitional Energy
                                                 Company LLC

18

19

20

21

---

22   [5] There are many examples of potential intervenors satisfying FRCP 24(a)(2) when they have private interests in the
23   matter, or simply represent a narrower public interest than the government defendants do. *See, e.g., Am. Farm
     Bureau Fed'n v. U.S. E.P.A.*, 278 F.R.D. 98, at 109-11 (2011) (associations of municipal wastewater dischargers that
     were subject to WLAs under a TMDL issued by EPA would not be adequately represented by EPA in an action
24   challenging the TMDL); *Citizens for Balanced Use*, 647 F.3d at 898-901 (U.S. Forest Service would not adequately
25   represent the interests of environmental advocacy organizations in an action by organizations that sought to reduce
     restrictions on vehicle use in a national forest); *Forest Conservation Council v. U.S. Forest Serv.*, 66 F.3d 1489,
26   1498-99 (9th Cir. 1995) (U.S. Forest Service would not adequately represent the interests of the state and county in
     an action by environmental advocacy organizations regarding management of a national forest); *Sierra Club*, 995
27   F.2d at 1481 (EPA would not adequately represent the interests of a municipal NPDES permit holder in an action by
     an environmental advocacy organization against EPA regarding the municipality's wastewater discharges).

28     NAVAJO TRANSITIONAL ENERGY COMPANY'S
     LIMITED MOTION TO INTERVENE AND
     MEMORANDUM OF POINTS AND AUTHORITIES IN
     SUPPORT THEREOF

SCHWABE, WILLIAMSON & WYATT, P.C.
Attorneys at Law
1420 Fifth Avenue, Suite 3400
Seattle, WA 98101
Telephone: 206.622.1711
Fax: 206.292.0460

PDX\130242\216853\SELA\19013597.1